Anybody going to need an interpreter in this case? I don't think so. Although my clients are primarily Filipinos, most of them speak English. Good morning, Your Honors. Scott Schutzman, and I represent the Belamide appellants. I'd like to first address the collateral estoppel raised judicata issue. The first element examined by the Court are whether or not the issues presented in the claims objection in the bankruptcy court were identical to the affirmative relief claim in the complaint filed in State court by my clients. I would submit that an objection in the bankruptcy court where the bankruptcy court rules that a party does not have standing to make said objection is different than an affirmative lawsuit against the lawyer for the creditor and the trustee and the same creditor alleging breach of fiduciary duty, fraud, malpractice, conflict of interest. Not fair. Why is the substance of the claim different? Well, first of all, the substance of the claim – first of all, the trustee and his attorney, there was no objection made to the trustee and his attorney. The claim was to equitably subordinate the claims of the creditor for claims trading. When you – the bankruptcy court rules that – The question is standing, right? The question below was standing. The judge ruled my clients had no standing. In the bankruptcy court. That's what the judge – Because you didn't represent the people who were supposedly injured, the bondholders. That's what the judge – that was – but if my clients were in fact damaged through a tort by that creditor or by the lawyer for the trustee and the creditor's committee, why is my right precluded? My damages are different. What I was trying to do in the bankruptcy court when I objected was stop distribution to the creditor. They were – they had $16 million worth of bonds. My clients were suing in the second action for affirmative relief because had those claims been disallowed, we would have been entitled to an additional $300,000 under our settlement agreement. That was a peculiar injury to my client. So that's the focus. The damages were different. The main thrust was different, although we were asking for equitable subordination. I mean, 16 – to disaffirm $16 million is different than $300,000 in damages. Plus, we brought a class action. No. $300,000 damages is the result of not allowing subordination, $16 million. It's not different from. It's just a different effect from the same substantive grounds. Well, they were – they were claims trading and some of the facts were the same, but the trustee was a different party in the second suit, correct? The trustee – I mean, I didn't bring an objection against – against the trustee. I didn't bring an objection against the trustee's lawyer. I didn't bring an objection against the lawyer for the creditor's committee. And the – Counsel, why wouldn't that be a trustee's action if there was harm to the estate of the bankruptcy? Why would – why would – how would your clients have standing to prosecute that cause of action? Sometimes when a wrong is committed, more than one party has the right to sue. I – I submit that it may – it may well have been a trustee's action. The trustee, they collected $46 million in this bankruptcy. The trustee spent, I think he testified, spent something like $5,000 investigating this claim and decided he didn't have enough information to bring a claim. The trustee may well have had a claim, but that doesn't preclude me or my clients if we have a claim as well because the estate didn't want to spend the money to pursue it. There – there can be a primary right of the estate and a primary right of my clients, but one doesn't preclude the other. What's your best guess authority for that proposition that if there's a harm to the bankruptcy estate, then an individual creditor has the right to pursue an action? Outside of the bankruptcy court. I didn't find – I don't have authority – I don't have authority for that proposition. The best I have is the authority in the Pan Am case, which alludes to the fact that the creditors' committee has a duty to the creditors. There's no case – there's no case that says I do or I don't, although the DiStefano case, which they cite, which is a district bankruptcy court case in Massachusetts or a district court case there, seems to indicate opposite. But we cite the Overmeyer case, which is, I think, a District Court of Ohio case, which says the opposite, that there is some duty to the creditors' committee. But to answer your question, I find – I find no case directly on point on that very issue. Isn't that revealing? I mean, one would think if you're right, these cases would be all over the place. Well, they say – but what the cases say is if the trustee and or the creditors' committee overstep – the creditors' committee commits an ultra-virus act, then you have a right to sue. For example, if you have a corrupt creditors' committee, there must be – there must be a right. Otherwise, the creditors' committee could take all the money and never distribute it. There must be a right. There must be a right to sue. And the cases – the cases, in fact, hint or say if it's ultra-virus, you can sue. So it just seems to me – Was there no way for you to have pursued this in the bankruptcy case? Well, that's – let me – that's a very good question. What happened – the first my clients heard of any claims trading was the August 1999 notice of intended action. Right. It was buried in the middle. When we got that, we did two things. We filed an objection and we noticed the deposition of Mr. Weiss, which has been attached to the record. He was co-counsel with Mr. Lebo. At the deposition, I would say at least 75 percent of the questions were objected to on attorney-client privilege grounds. After the judge denied our claim, we had two options. One was to appeal that. Right. But basically, we weren't – I mean, we weren't given discovery. We filed an affirmative case where we could take discovery. That's the second arm of collateral estoppel is it wasn't fully and fairly litigated. Well, there was no appeal taken, right? There was no appeal taken, no. And why is that? It was a – we had two options. One was to appeal the claims distribution. But based upon what we had, we had a record where there were primarily attorney-client privilege objections. Did you seek a discovery referee's ruling that those were being litigated? No. We presented what happened to the Court in our papers or in our reply papers, and the Court ruled against us. We did not – Do you believe that the objections on grounds of attorney-client privilege were properly taken? Well, there's a crime-fraud except – no. Because there's a crime-fraud exception, we were alleging fraud. Why didn't you seek relief in the trial court? There was a very – And force the answer. There was a limited time period. We made the decision to file case number two. But I would submit that the first – Case number two being a wholly new class action. Right. In State court. X months later in State court. Correct. That's right. And I would submit that that goes to the fact that the issue was not fully and fairly litigated. Had the attorney come in and just answered the questions, I think – I think there may have been a different issue. But I'm having a hard time figuring out why you didn't have the opportunity to pursue this. This all comes out of the same operative nucleus. The fact you were in court, you had the opportunity, and you're just telling us, well, you made the decision to go file a class action in State court. Well, if the judge – the judge indicated in the transcript, which I think is before the court, you know, if you find – if you find the creditors, you could sue them, but I don't see that you have a right. I mean, that was – that was her – that was her ruling based upon the equitable subordination. What I – what I read from her ruling was if you think you were damaged, go file a class action. If you deny these claims or subordinate these claims. So if we were wrong, which I believe we were, we filed action number two. We filed that class action for the wrongs that we believed were incurred. But you do agree that you could, in retrospect, have filed your – made the same motions or presentations in the bankruptcy court had you decided at that time either to get the deposition questions, which were objected to on the grounds of attorney's own privilege? There was an issue. Let me just say, there was an issue as to whether an appeal could have been taken, whether that was final. As there's not been a final distribution, there was an issue as to whether that was final at that point. I think we – I think we could have tested it and appealed and saw whether we were dismissed as to the bankruptcy matter not being final. But I still believe that it was a different fundamental issue. But you're running upstream against the purpose of doctrines like collateral estoppel that say, hey, once you're in the ring, you've got an opportunity to fight it out for ten rounds. And if you're going to retreat and then try to come into another ring, there has to be an end to life at some point. And you walked away from your opportunity in the appropriate forum to play this all out. And therefore, collateral estoppel says, you know, when is this going to be over? But I think collateral estoppel – I believed at the time that collateral estoppel had to be identical – an identical matter. The trustee's attorney, that issue – that issue was a – It isn't a – it arises out of the same operative nucleus of facts. You're simply trying to put new labels on something. And that's what issue and claim preclusion and all those doctrines are all about. You just can't come in with a new label and say, guess what, now it's this. I don't – I don't – Now it's that. And because we style it in a different way, we escape the clutches of these preclusive doctrines. I didn't believe so. I thought that the trustee's attorney was a new party. And attempting to get damages from him was not litigated when the objection was made to the creditor and the creditor's attorney. So I don't – you know, I understand – I understand the way you see it. I just don't see it that way because I believe that there were different parties and – and there was no issue related. But the malefactors or alleged malefactors were not different parties. See, Carmel and Gabriel. Sure. And your claim was that they used insider knowledge in buying these – these obligations. Right? So that's the nucleus. You've got two heavies and they did the same dirty deeds. Regardless who can enforce it, maybe the trustee had a heart attack and another trustee came in. That doesn't change the situation, does it? Well, I think what changes it is that the attorney or the trustee being the attorney for the creditor's committee, there was no ability – the conflict of interest issue – the conflict of interest issue was not raised on that objection. And I think that's a different issue. Well, did you raise that in the bankruptcy court? No. It was raised – it was raised in my – it was raised in my complaint. It wasn't, but that – I believe that's a different issue. That issue wasn't raised. But it could have been raised in the bankruptcy court, could it not? I'm not – I don't think – I don't think it – it ultimately – we're back in the bankruptcy court. I mean, you know, could it? I assume there's – Collado-Ostavo doesn't apply just to the issues that were similar that were indeed litigated, but also those which could have been litigated within the framework of the litigation. Right? Yeah. I suppose – I suppose an adversary action may have been filed, but we were sent back there for that very purpose when the judge issued an injunction against my second action in the bankruptcy court, and that was appealed, and that went before the bankruptcy appellate. Okay. I would just briefly like to address the immunity issue. And there's been a lot of briefing about the Barton v. Barber immunity issue. That immunity has been extended to a trustee in bankruptcy. It's been extended by the Stoll case to the attorneys for the trustee in bankruptcy. It's never been extended, nor should it be extended, to the creditors' committee or the attorneys for the creditors' committee. And I would submit in a situation where the attorney for the trustee takes on and wears a hat as the attorney for the creditors' committee, he should not be entitled to such immunity. Otherwise, you would never be able to bring up redress for a dishonest or an attorney operating under a conflict of interest. Counsel, what's your best case authority for the proposition that counsel to the creditors' committee has a fiduciary duty to the creditors generally? There's a number of cases that say it out. There's no case in the Ninth Circuit that I found. The Pan Am case from the Bankruptcy Court of New York, the PWS Holdings case, there's all sorts. But it says the creditors' committee owes a duty to creditors. Right. Where does it address the creditors' committee attorney? Right. Okay. The DiStefano case says that there's no duty. But the best case would be the Overmeyer case, which says, it basically says that the creditors' committee It doesn't say the attorney. There's no case on the attorney. There's no case on that. And this is a, on that issue, to the extent you get to that, this is a case of first impression on that issue. There was no issue. Who was the, who were the clients? Who was the client of the attorney that we're talking about? All right. The attorney that we're talking, Case Scholar, represented Mr. Durkin, who was the trustee. With court approval, the same firm also represented the creditors' committee. Right. And you're trying to extend some kind of a responsibility to the creditors also. Right. I believe the credit, I was an unsecured, my clients were an unsecured creditor. The creditors' committee supposedly represented my clients. I believe the attorney owed my clients a duty. Who represents, who represents my clients? The creditors? No. But I believe that if the credit, if the same attorney can represent the creditors' committee, that's both sides of the case. And there's no one representing my clients. They were able for four years not to disclose that there was claims trading going on. It seems to me that they're shielded only when they're forthright. And I think there were some findings on that issue by the district court judge. But there has to be some duty of disclosure for an unsecured creditor who's not on the creditors' committee. He doesn't get information but for from the creditors' committee or the attorney from the creditors' committee. There has to be some duty running to him. Counsel, could you please discuss the law of the case not to disclose? Sure. The court found that since my, the court below, the bankruptcy court found my clients had no unique or personal injury. She said, therefore, the law of the case doctrine applied that since she made such a ruling that there's no way that my clients could recover. However, my clients had unique and personal injury because of the step increase in the settlement agreement. My clients had a unique settlement agreement where if 50 percent, 50 cents on the dollar was recovered, they would recover an extra $300,000. So despite the fact that the bankruptcy court had already approved the reorganization which encompassed the matters of which you complain, you don't see that the law of the case bars remitigating? No. I'll tell you why. The plan was confirmed September 1990. My clients filed the claim in December 1990. The plan was confirmed before we even got involved in the case. We're alleging in our complaint that the claims training was ultra-virus. How about the distribution order, though? That was after you filed your claim, wasn't it? I believe the distribution order was later. But didn't that necessarily approve? The notice of intended action was first delivered August 1999. That disclosed that four years prior the claims training occurred. There was no way that my clients could have challenged it. We didn't know about it. A month after we found out about it, we filed our objection. We didn't know about it any sooner. And it would be an unfair rule that for things that happened before, we were somehow precluded. What about when the distribution order finally came down? You knew then, at that point. There's not been a full distribution yet. There's not been the first order that we received about distribution was that this issue occurred was August 1999. That was the first order that we saw that even discussed it. There was no plan approval order, which the bankruptcy court talked about in the law of the case doctrine. The only other order in the case that we saw was September 1990. There was nothing between September 1990 and August 1999. And so in August 1999, what was the effect of that? There was a notice of intended action that the bankruptcy trustee intended to distribute funds. The order and that there was this issue that arose in connection with claims trading. And so at that point, you could have challenged the proposed distribution order. I did. I filed the objection. And the court made the ruling that your objection was not well taken. So now why isn't that law of the case? Because the court said, based upon the fact that we had no unique, peculiar injury. I say it's not law of the case because I had different primary rights against the trustee, the trustee's attorney. But you're saying argument that it's a difference. It's the same facts, different injuries. That's correct. Your lawsuit in the State court, class action, exactly what were you seeking to recover? We were seeking to recover one for my clients, the additional $300,000. $300,000, right. And we filed the class action in the things that came down September 1999, the notice of intended action. It showed the other settlements. And it showed, at least on that piece of paper, two or three other creditors had the same type of agreement we did with step increases if they got over 50 percent. During discovery, we were going to discover the commonality. But everybody would have done better had these claims been disallowed. What does everybody would have done better in dollar terms mean? Well, if you're not paying $16 million in bond claims to a creditor who claims traded, there's arguably $16 million to be distributed to all the other creditors. Under the status quo, what have your clients recovered? I think my clients recovered roughly, I think it's around $300,000 on a claim that was allowed for a million two. And I'd like to reserve the rest of my time for rebuttal. Thank you, counsel. Thank you. Three lawyers going to argue? Just two, Your Honor. Just two. Okay. Your Honors, good morning. Larry Hilton of Hewitt & O'Neill, appearing on behalf of the Carmel Appellees. I will be addressing the finality doctrines of res judicata, collateral estoppel, and law of the case. Ms. Danker will be arguing for the Durkin appellees, and she will address the immunity issues. And she may also have some additional points on the finality doctrines because they apply to her client as well. Your Honors, the legal issues, the finality doctrines that I'm here to discuss are well-established doctrines. There's not much cutting-edge law to discuss. It's really a question of applying the facts of this case to those doctrines. And we believe that the bankruptcy court properly applied the doctrines of res judicata, collateral estoppel, and law of the case to the facts of this case, to the facts of this case. And I want to briefly address each of those issues. Before I start, however, I do want to make a brief point that there is nothing in the record that indicates that there was any wrongdoing or wrongful conduct by the Carmel appellees. I know that Appellant's Counsel has allegations, and I understand that that's what this is about. But we're here to discuss the legal issues. But representing my client, I do want to make that point that the record reflects that there was an investigation done. Nothing was found. And I think it's important to make that point at the outset. Turning to the doctrines themselves, I'll start with collateral estoppel. The issue of whether appellants have standing to bring a claim in State court for damages is the identical issue that was decided by the bankruptcy court. The fundamental facts in this case, and I don't want to be repetitive, but it's very important to understand these, is there is a universe of claims. There was a bankruptcy plan. It was allowed in 1990. And it defined a universe of allowed claims. And then there is a pot of money. And that pot of money is going to be paid to that universe of claims, regardless of the identity of the claimant. So the fact that the Carmel appellees acquired claims from financial institutions has no effect whatsoever on the other claimants. All it changes is the identity of the party receiving the distribution. If there's $100 million of claims and $10 million, every claim is going to receive $0.10 on the dollar. And if Carmel bought the claims for $0.05 on the dollar. Kennedy. Somebody else doesn't get that money. The claimant that they bought the claims from may have a beef, may have a gripe and say, wait a minute, I should have gotten more than $0.05 on the dollar. But to the claimants, other than to the two parties who traded claims, every other claim is going to receive the same distribution it would have received. And that's what Judge Adler recognized when she said in 1999 that appellants lacked standing because they had suffered no injury. There was no injury. That's the case to this day, Your Honors. Now, after that happened, appellants came up with a new idea, and that was the individualized harm idea that we've heard about, that, wait a minute, we did suffer harm because these claims could have been disallowed. And that's our injury. Was there any theory upon which the claims could have been disallowed if they had not been transferred to Carmel and Gabriel? No, Your Honors. They could not have been disallowed at the time that they were acquired by the Carmel Appellees. And the only basis of their being disallowed was the supposed insider knowledge trading that Carmel and Gabriel engaged in. That was the argument that was made that they should be subordinated was because of the insider trading. And the Court expressly rejected that. Yes. The argument that appellants came up with afterward was the same, would have had the same result, but it was a different legal theory. And that was that at the time that the Carmel Appellees acquired the claims, they knew that the claims were weak and subject to disallowance, but they kept that information secret. In fact, Your Honors, the record is absolutely clear that that's not the case, because at the time that the Carmel Appellees acquired the claims, the plan was already Now, as a factual matter, their claim is irrefutably flawed, and that was their way of trying to create an additional issue of individualized harm. Now, not only is that clearly refuted by the record, the confirmed plan, which is raised due to Cata, which conclusively allowed those claims, it was a final order long before the claims were ever acquired. So the claims could not have been disallowed. The Carmel Appellees were conclusively allowed to receive the full distribution. But that, even if that were the – even if there were some argument there, it doesn't change the collateral estoppel argument because – or the raised due to Cata argument, because we had a hearing in 1999, and raised due to Cata bars any claims that were made or could have been made. And collateral estoppel bars relitigation of an issue. And if we – if the rule were that you went in, litigated an issue or a claim and lost, and if a couple years later you came up with a new idea, oh, wait a minute, here's another idea, I can go back and relitigate it, I submit, Your Honors, that the finality documents would be eviscerated and meaningless. That's not the law. If they didn't think of the argument about the disallowance in 1999, that has no effect on raised due to Cata and collateral estoppel. Their issues are still litigated. They were litigated. They are final. The claims were litigated. They are final. The issue of raised due to Cata I want to address briefly. There are really two issues of raised due to Cata. One is that the bond claims were allowed by the plan. That's raised due to Cata. And therefore, as a factual matter, their argument that the claims could have been disallowed is, as a matter of law, cannot – cannot succeed. But in a bigger sense, Your Honors, in order for the appellants to proceed with a claim in State court under their theory, they've got to convince a State court judge that Judge Adler, the Federal bankruptcy judge, blew it when she allowed those claims. They have got to relitigate the claims allowance procedure. There is no way they can get around that. If they're going to claim as individualized harm that these claims should have been disallowed, then they want to relitigate in a State court the claims allowance issues that were already determined by Judge Adler and which Congress has – has said that the Federal district courts have exclusive jurisdiction to litigate, and then by reference to the bankruptcy court. Your Honors, I can't stress that enough. There is no way that they can show individualized harm without asking a superior court judge to second-guess Judge Adler and relitigate claims allowance. That, Your Honors, is the point, one of the fundamental reasons why bankruptcy reorganization plans are race judicata. We don't want to let disgruntled creditors, any creditor who thinks they got a raw deal in a bankruptcy, we don't want to let them 10 years later go into State court and ask a State court judge in a class action to let's bring back that entire creditor class, which is what they want to do here, and let's redo it. That's why that plan is race judicata. And, Your Honors, if we let disgruntled bankruptcy claimants go, relitigate in State court, I submit not only is that – does that fly in the face of all the finality doctrines, but it is the very case. Kennedy. That's when the lawyers will really get all the money. There are – I can't begin to explain all the reasons why that would be a bad – a bad thing, Your Honors. Finally, I'm about ready to finish here. The law of the case doctrine, very much the same thing. One point that the appellants made in their reply brief is that the parties were different. And, Your Honors, the DeSimone case is right on point there. The parties do not have to be identical. And we believe that the Bankruptcy Court properly applied all of the finality doctrines in this case. What's your response to opposing counsel's argument that the first run was on a standing issue and the second run was on the fiduciary duty issue? What's your response to that argument? I believe that Your Honors already raised that, but it's a common nucleus of facts. And the label that you put on your argument is immaterial. Fundamentally, their injury comes from the same common nucleus of facts, whether they want to call it an affirmative claim for negligence or fraud or whether they want to call it an objection to a claim. Their injury is the same. But opposing counsel's argument is that at the time the ruling was made on the plan confirmation, there was no evidence in the record regarding the alleged breach of fiduciary duty. At the time that the plan was allowed, my client hadn't even acquired the claims. And so, therefore, that's what's baffling to me, that the Court already determined that these were bond claims, these were financial instruments, and the Court had determined that they would be allowed. And three years later, my client acquired them. I have to confess I don't really understand counsel's argument, other than to say that the claims were allowed by a final order that was res judicata. I'm sorry, Your Honor, if I haven't ---- Your view is the identity of the person who owns the claim doesn't matter. That's correct. Once they're allowed by the Court, Your Honor, that is correct. At this point, Your Honor, I'll allow Ms. Danker to ---- Thank you, counsel. Thank you, Your Honor. You're getting short of a minute. We'll give you another minute. Thank you very much. Good morning, Your Honors. Ashley Danker of K. Scholar LLP. On behalf of K. Scholar and Mr. Ronald Lebo, I'll refer to them both collectively as K. Scholar. I would like to address the following four points, the first being that individual creditors of a bankruptcy estate do not have standing to bring an action against the counsel to the creditors' committee. And that's the DiStefano case in our brief. The second would be, even if the Court were in some way troubled by DiStefano, the Velamiti claimants lack standing to pursue claims which are based on a generalized injury to the bankruptcy estate. Only the duly authorized representative of the bankruptcy estate has standing to do that. That's the Stoll case and the Eisen cases. The Velamiti claimants are not duly authorized representatives of the bankruptcy estate. We only become one pursuant to Section 323 of the Bankruptcy Code or pursuant to Section 1123b3b of the Bankruptcy Code, and that's actually Mr. Durkin in this case. Now, so what's your response to opposing counsel's argument that if you have a creditors' committee and a creditors' lawyer who, and the trustee who are all in cahoots, there's no way to rectify that? What's your response? My response would be that the members that first, pursuant to the plan in this case, the plans expressly contemplated that the trustee and the committee could be served by the same counsel. So as an initial matter, there was no problem with that. The interests were viewed as being identical. To the extent that an individual creditor might assert that the committee itself was being corrupt, they had various remedies to them. The members of the committee are actually, pursuant to 1102 of the Bankruptcy Code, they're appointed by the office of the United States trustee. If a committee is accused of being corrupt, the first remedy of a creditor is to go to the office of the United States trustee, raise their allegations with the office of the United States trustee. If they don't receive relief there, they can then go before the bankruptcy court, bring their allegations before the bankruptcy court, where they will be taken very seriously. And if the court agrees that there's a problem there, the court can order the U.S. trustee's office to act and to replace committee members. The last remedy that would be available to them would be perhaps to suit against either the committee itself or the individual member of the committee, but not against the committee counsel. I would then go on to say even as purported representatives of the bankruptcy estate, the Belamity claimants would lack standing to pursue their State law claims against Kay Scholar, because the bankruptcy court did preclusively determine that there was no injury either to the Belamity claimants themselves or to the class which is defined in their complaint as all claimants, claim holders of the ICA bankruptcy estate, that there was no injury to those parties, that the only parties who could conceivably have suffered any injury were the parties who sold their bond claims to Carmel and Gabriel, and those parties had not complained and come before the bankruptcy court. The last point would be quasi-judicial immunity. Quasi-judicial immunity is available to Kay Scholar both in the context of its representation of Mr. Durkin and in the context of its representation of the committee. We've cited numbers of – a number of cases holding that a debtor, a trustee, and their attorneys are within that common law protection. It's a logical extension of that protection to a committee and its counsel. We've also cited the PWS Holdings case from the Third Circuit, which finds that there's also statutory authority under 1103C that a committee and its counsel in that case were entitled to immunity. The question then becomes, under the specific facts of the case, has the counsel done something to in fact assure that they are protected by that immunity? And Kay Scholar did. Kay Scholar went before the bankruptcy court in 1999, laid out all of the facts, what happened in 1995, what happened prior when the investigation was done, disclosed all of that to the court, and asked the court for authority not merely to make a further interim distribution in the case, but also to make a final distribution in the bankruptcy case. And the bankruptcy court listened to the objections that were raised by the Belamity claimants and decided that it was appropriate under the analysis of the case to approve both an interim distribution and to authorize counsel to make a final distribution in the case at the appropriate time. That was a final order. It gave us authority to make a final distribution in the case when we were ready to do so. That was a final distribution. But that order was never challenged. Now, before the district court, the district court had raised a question vis-a-vis the 1995 distribution and said, well, there was no candid and fair disclosure before the bankruptcy court at the time of the 1995 distribution. And our response to that was, well, actually we didn't get to argue, but had we been able to argue before the district court, what we would have pointed out was the fact that in 1995, first, there were no recoveries from the Durkin v. Shields litigation. So there was no benefit. And the Durkin v. Shields litigation is the basis on which the Carmel or excuse me, the Belamity claimants' claims are asserted, that there was some sort of inside or nonpublic knowledge regarding that lawsuit. That lawsuit took 7 years and over $22 million worth of fees and costs before it finally reached a successful conclusion. Kennedy.  And it took 7 years and over $22 million worth of fees and costs on the side of Mr. Durkin and his professionals to bring that case to a successful conclusion. That case actually yielded 16 published opinions from district courts, and including one from this Court, Your Honor, was on the panel in connection with that. That was a very hard-fought litigation. And back in 1995, certainly the result of that litigation was still far from clear. The very first recoveries, a small recovery of $2 million, wasn't achieved until 1997. It was Judge Adler's comment, even, you know, in 1999, that when Carmel and Gabriel presumably purchased their claims back in a window of time that's somewhere between 1992 and early 1994, that there's no way they could have been ---- well, first, they weren't on the committee anymore. They had departed the committee in December of 91, and that at the time they did that, the most that they could have known is, well, a lawsuit was going to be filed. Well, they presumably purchased their claims after that lawsuit was filed. That's what they've told us. The lawsuit was a matter of public record. The theories of that lawsuit were a matter of public record. But it took 7 years and $22 million to bring that lawsuit to a successful conclusion. And what was the result of the ---- what's the successful conclusion? The conclusion was recoveries of, I believe it was 30? 43 was it? 43 million dollars, which was a good result. But in light of the cost, it wasn't a phenomenal result. But it was a good result. One would anticipate from the intensity of the litigation that probably the professionals on the other side incurred fees of at least the equivalent of what the trustees had incurred. But in connection with approving a further interim distribution and a final distribution in 1999, the Bankruptcy Court expressly accepted the conduct of the trustee and the trustees' professionals, which included Kaye Scholar. And when she was referring to professionals, I believe she was also referring to Kaye Scholar in its capacity as counsel to the committee. She expressly accepted that. And it's our view that her acceptance of that, which she confirmed in 2000 when we were before her in the context of our injunction motion, that that acceptance is preclusively bars, bars the Blomody claimants from asserting that Kaye Scholar acted in an ultra-virous fashion. The Court accepted that. The fact that we didn't come before the Court in 1995 was, in effect, ratified by the Bankruptcy Court at that time. And that's the Grouse case that we cited in our brief, the opinion from the Fourth Circuit, where a debtor's attorney ultimately was sued for malpractice by their client. And the facts of the case were that the debtor had come before the Court in the context originally of an interim fee application and then a final fee application. And at the time of the final fee application, the debtor knew of the facts which gave rise to the malpractice claim, chose not to bring them, and instead later sued the debtor's attorney in State court asserting malpractice. And what the Fourth Circuit found in that case was that the debtor's attorney had the right to rely on the finality of that of the order on the fees for the evaluation of their services and what they were entitled to receive in connection with their services. And the fact that these the facts that gave rise to the malpractice claim had come up at the time of an interim fee application, it didn't matter. It was known at the time of the final approval, and the final approval effectively blessed what the attorney had done back at an interim stage of the case. Roberts, your time has expired. Do you have anything else you need to tell us? Simply to say our facts are stronger than they are in Browse. In fact, in 1999, the facts of the 1995 distribution were before the Bankruptcy Court. They were accepted by the Bankruptcy Court. And for those reasons, we would ask this Court to affirm the Bankruptcy Court's dismissal of the complaint against Kay Shuller with prejudice. Thank you, counsel. Thank you. Roberts, just two brief points in response to Mr. Hilton's argument. One, we allege in paragraph 26 of the State court complaint that the Morgan Stanley and Executive Life claims that Carmel and Gabriel purchased were questionable, and the trustee and his attorney should have disallowed them. The second thing is that, based upon the fact that that complaint is a class action, I believe in some sense I represent the sellers of those claims to Carmel and Gabriel. And with that, unless you have any questions, I would suggest that. Mr. Hilton says that if we allow you to go forward in the State court, that the short of it is that you have to convince the State court that Judge Adler was wrong in her handling of the core of this case. Is that right? No. As a practical matter, it is before the Court. The case has been sent back to Judge Adler. Judge Adler is going to be, if I did prevail, Judge Adler would be deciding this case. And deciding that Judge Adler was wrong. Well, Judge Adler, at least it would be before Judge Adler to get some decision on the record. She issued an injunction, and I appealed that, and the Court said the case, the injunction was meant to bar me from State court, but not bankruptcy court, and sent it back, leaving open the issue of collateral estoppel and re-judicata. But aren't you asking Judge Adler to send you back to State court? No. I misapprehend that. No. That's not correct. I'm asking Judge Adler to decide the issue on the merits, whether the attorney had a conflict with. Okay. And I'm asking her to just decide the issue, let me litigate the issue, and then to make a decision on the issue, and she and no one else would be the person deciding. That's the way it plays out in this case. But had you ended up in State court, you'd be asking the State court to undo the bankruptcy judges. I would not. No, I think those issues are different, and I would ask the State court to decide the issues in my State court complaint, which, as a practical matter, is now an adversary proceeding before Judge Adler if it's allowed to survive. All right. Thank you, counsel. Thank you. We appreciate your help from both sides. The case is well briefed, well argued, and it's submitted. Buckley v. Terhune, our final case on the calendar for this week.
judges: Rawlinson, Trott, Bea